# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SHAUN LEARY,

        Plaintiff,

v.                              CIVIL CASE NO. 03-60021
                                 HON. MARIANNE O. BATTANI

LIVINGSTON COUNTY, et al.,

        Defendants.

_____/

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Before the Court is defendant McGuckin's Motion for Summary Judgment (Doc. #65), defendants Livingston County and Sheriff Donald Homan's Motion to Dismiss or For Summary Judgment (Doc. #66), and defendant Scott Stone's Motion for Summary Judgment (Doc. #67) and Objections to Magistrate Judge Pepe's May 31, 2006, Order (Doc. #100). Leary claims that his Fourth, Fifth, Eighth, and Fourteenth Amendment rights were violated when he was beaten by other inmates during his incarceration at the Livingston County Jail.[1] Stone asks the Court to disregard a witness's deposition testimony. He also seeks summary judgment, contending that there is no admissible evidence to support the claims against him, and that he is entitled to

---

[1] Defendants Jonathan Sanborn, Tarnesia Parks, James Murphy, Vicky Lumley, Michael Nast, Thomas Stocker, Kimble Carter, Victoria York, Kristy Swanson, and James Armstrong were dismissed with prejudice on April 24, 2006, by consent. Likewise, by stipulation and order, Defendants Kirk Daniels, Cheryl Miks, and William Schuster were dismissed with prejudice on June 29, 2006, leaving only defendants Livingston County, Homan, Stone, and McGuckin.

qualified immunity.  Likewise, McGuckin seeks summary judgment, contending the conduct and injury described are *de minimis*, that there is no admissible evidence to sustain Leary's claims, and that he is entitled to qualified immunity.  Livingston County seeks summary judgment, contending that it is not a proper party to the suit and that Leary has failed to establish it had a custom or policy that caused the alleged violation.  Similarly, Homan seeks summary judgment, contending that Leary has failed to establish a failure to train or supervise claim.

## II.      STATEMENT OF FACTS

On Saturday, February 11, 2000, Leary was arrested on a warrant charging him with criminal sexual conduct in the first and second degree.  He was immediately transported to the Livingston County Jail.  The complainant was the nine-year-old sister of Leary's girlfriend.

When Leary first arrived at the jail, one of the corrections officers, Denis McGuckin, allegedly began harassing Leary during his intake and processing, calling him a "sick bastard" and throwing paperwork in his face.  Also during this initial intake process, Scott Stone warned Leary that an assault at the hands of fellow inmates was likely once the other inmates discovered that he was in jail for allegedly molesting a child.  Stone also admitted in a handwritten statement that, "I did mention to [Leary] that once the other inmates found out what he did that there would be no protection from anyone here at the jail."  Stone then allegedly set out to ensure that the charges against Leary were widely known by the jail population.  Stone began by telling inmate

Duane Kimmel, with whom Leary was being deloused, that Leary raped a nine-year-old girl.

After the initial intake process, McGuckin and Stone escorted Leary  to pick up a bin of sheets, towels, and other items.  Leary alleges that after he picked up his bin, McGuckin struck

2

him in the back of the neck with a "karate chop," causing him to drop the bin.  Stone, who was standing right next to Leary at the time of the alleged assault, claimed that he turned away for a "split second," and therefore, didn't know if McGuckin struck Leary.  However, Stone acknowledged that McGuckin caused Leary to drop the bin.

After placing Leary in his cell, Stone allegedly used the jail's intercom system to contact inmate Ross Hinchey, the so-called "Rock Boss"[2] of the Livingston County Jail.  Stone told Hinchey that "the new guy in [cell] 127N" "was in for raping a nine-year-old girl."  Stone allegedly told yet another inmate that Leary raped a nine year-old girl.  From that point until Sunday night, Leary was taunted and threatened by fellow inmates, who called him a "baby raper," "child raper," and a "bitch."

On Monday, February 13th, the threats and intimidation continued to escalate.  This led inmate Raymond Holley to advise the corrections officers that Leary had been threatened, and that there was going to be a fight.  Likewise, inmate Glover contends he warned several prison guards that Leary was in danger.

That day at approximately 6:15 p.m., Leary left his cell to make a telephone call.  While he was on the telephone, Glover grabbed him from behind and pulled him over a nearby railing.  Other inmates then punched and kicked Leary as he lay on the ground.  When he regained consciousness, he was bloody, beaten, and being carried to safety by Holley.  Following the assault, he was taken to the McPherson Hospital Emergency Room and later admitted to St. Joseph Mercy Hospital, where he remained for two days.  Leary had to return to St. Joseph's Hospital four weeks later for surgery to repair the damage to his nose and facial bones.

---

[2]  A "Rock Boss" is an inmate who is "in charge" of his area within the jail.

Following the assault, the Livingston County Sheriff's Department launched an internal criminal investigation aimed at identifying and prosecuting the inmates that perpetrated the assault. Several inmate interviews were conducted as part of this internal investigation. During the investigation, Leary claimed that McGuckin assaulted him, and that the prison guards encouraged and protected the inmates that perpetrated the assault. Although the focus of the internal investigation was on the criminal culpability of the inmates, inmate interviews corroborated Leary's allegations that corrections officers encouraged and orchestrated the assault. Once allegations of prison guard complicity surfaced, Sheriff Donald Homan turned the criminal investigation of the corrections officers over to a Mission Team from the Michigan Sheriff's Association. The Mission Team consisted of two officials from two different sheriff departments; Lt. Dale Miller of the Ionia County Sheriff's Department and Sgt. John Fontana of the Genesee County Sheriff's Department.

The stated purpose of the investigation, was "to look into the matters of an assault by corrections officers McGuckin on inmate Leary and any possible conspiracy/corruption allegations amongst officers." Report by Sgt. Fontana, dated 3/14/00, at pp. 2. Fontana and Miller interviewed both McGuckin and Leary, and each essentially repeated what they told the deputies during the internal investigation. The Mission Team arranged for Leary to take a polygraph regarding his allegations that McGuckin assaulted him. He passed the polygraph. After he initially told the Mission Team investigators that he had "no problem" taking a polygraph, McGuckin later refused to take the test.

The final report of the Mission Team found Leary's allegations against McGuckin

4

substantiated, and submitted the case to the prosecutor's office for review on March 20, 2000.

Ultimately, the County Prosecuting Attorney, David Morse, denied the warrant, citing

"insufficient credible evidence absent polygraph results," which he explained meant that there

was not enough evidence without McGuckin taking, and failing, a polygraph.

The Mission Team also concluded that there was no evidence of a conspiracy amongst

the guards to have Leary assaulted by other inmates. However, Leary contends that the

Livingston County Sheriff's department withheld documents created during its internal

investigation from the Mission Team to ensure that the Mission Team would not learn that the

assault was instigated by prison guards. Leary also maintains that the Mission Team did not

thoroughly investigate the allegations that the guards were complicit in the assault because the

Mission Team only interviewed three inmates and two corrections officers.[3]

## III.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be

granted when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment,
> after adequate time for discovery and upon motion, against a party who fails to make a
> showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

[3] The original investigation included interviews of fifty-two inmates and seven
corrections officers.

The movant bears the burden of demonstrating the absence of all genuine issues of material fact.  See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002).  "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to  support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002).  "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  Anderson v. Liberty Lobby Inc., 477 U.S. 242,  256 (1986).  The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor.  See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient

6

evidence upon which a jury could reasonably find for the non-movant.  Anderson, 477 U.S. at 252.

## IV.   ANALYSIS

### A.   Magistrate Judge Pepe's Ruling Allowing Certain Deposition Testimony in Leary's Response to Defendants' Summary Judgment Motion Was Not Clearly Erroneous or Contrary to Law

This Court may reconsider any pretrial matter "where it has been shown that the magistrate's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A) (1988); FED. R. CIV. P. 72(a) (district court shall modify or set aside any portion of magistrate judge's order on a non-dispositive matter found to be clearly erroneous or contrary to law).  Stone contends that Magistrate Judge Pepe's order allowing Glover's testimony to be used for summary judgment purposes is contrary to law and fundamentally unfair because his counsel was unable to question Glover.  Stone contends that allowing the use of his abbreviated testimony violates the Fourteenth Amendment Due Process Clause, an analogous Sixth Amendment right to confrontation, and Federal Rules of Evidence 611(b) and 403.

on January 24, 2006, Glover allegedly stormed out of his deposition asserting his Fifth Amendment right against self-incrimination.  This left Stone's defense counsel unable to examine Glover.  Since that date, Stone never attempted to compel Glover's testimony.  Rather, on April 20, 2006, Stone for the first time sought to strike Glover's testimony in a contemporaneous summary judgment motion.  On May 31, 2006, Magistrate Judge Pepe signed an order allowing the parties to use Glover's testimony for summary judgment purposes and ordered Glover to reappear for deposition.  The ordered also provided for contempt penalties if Glover did not cooperate.  Stone's attorney could have sought to compel his testimony and

exercised his client's right of confrontation after receiving Magistrate Judge Pepe's order. He

did not. More importantly, Stone has not shown that Magistrate Judge Pepe's order was clearly

erroneous or contrary to law.

### B.      Admissibility of Leary's Exhibits

McGuckin contends that Leary overwhelmingly relies on hearsay statements recorded

in investigative reports, and that those statements should not be considered because they are not

sworn or verified by sworn testimony. However, Federal Rule of Evidence 803(8) specifically

exempts investigative reports produced by public agencies from the hearsay rule.

> Rule 803(8)(C) of the Federal Rules of Evidence provides an exception to the
> hearsay rule for reports or records of public offices or agencies setting forth
> factual findings resulting from an investigation made pursuant to authority
> granted by law. Such matters are presumptively admissible by virtue of their
> being based in legal authority and duty unless the sources of information or other
> circumstances indicate a lack of trustworthiness.

180 A.L.R. FED. 61. The A.L.R. section goes on to explain the rationale behind the rule:

> The Federal Rules of Evidence provide that a witness may not testify to a matter
> unless evidence is introduced sufficient to support a finding that the witness has
> personal knowledge of the matter. The courts in the following cases applied the
> requirement of firsthand knowledge in determining the admissibility of factual
> findings contained in an investigative report of a public office or agency under
> Rule 803(8)(C) of the Federal Rules of Evidence and recognized it is not
> necessary that the public office or agency or the author of the report have
> firsthand knowledge of the matters contained in the investigative report as long as
> the author of the report has firsthand knowledge of the statements of a declarant
> who did have firsthand knowledge of the matters.

Id., at § 10. Therefore, the reports are not hearsay, and are admissible.

Stone, like McGuckin, argues that the investigative report exhibits should not be

considered by the Court because they are inadmissible hearsay. Again, however, FED. R. EVID.

803(8) specifically exempts investigative reports or records of public offices or agencies setting

forth factual findings resulting from an investigation made pursuant to authority granted by law.

The reports, and accompanying statements made by witnesses recorded in the reports, fall under

this exception.  Moreover, inmate Glover's inconsistent statements made pursuant to the

investigation and his subsequent deposition, as well as Stone's handwritten, signed statement are

not subject to exclusion as hearsay under 802:

> (d) Statements which are not hearsay. A statement is not hearsay if--
> (1) Prior statement by witness.  The declarant testifies at the trial or hearing and is
> subject to cross-examination concerning the statement, and the statement is (A)
> inconsistent with the declarant's testimony, and was given under oath subject to
> the penalty of perjury at a trial, hearing, or other proceeding, **or in a deposition**,
> or (B) consistent with the declarant's testimony and is offered to rebut an express
> or implied charge against the declarant of recent fabrication or improper influence
> or motive, or (C) one of identification of a person made after perceiving the
> person; or
> (2) Admission by party-opponent.  The statement is offered against a party and is
> (A) the party's own statement, in either an individual or a representative capacity
> . . . .

FED. R. EVID. 802(d)(emphasis added).  Therefore, because both Glover's deposition testimony

and Stone's handwritten statement fall under these exceptions, the Court will consider the

exhibits when determining whether to grant Defendants' motions for summary judgment.

### C.    The Excessive Force Claim

Leary alleges that McGuckin used excessive force when McGuckin karate chopped him

in the back of his neck while escorting him to his cell.  McGuckin counters that the conduct and

injury described is de minimis, and that there is no medical evidence of an injury.

The Sixth Circuit has not specifically identified what constitutional right is violated when

a post-arrest, pretrial detainee is alleged assaulted by prison officials.  "In this circuit, a 'seizure'

under the Fourth Amendment continues at least 'throughout the time the person remains in the

custody of the arresting officers.'  Johnson v. City of Cincinnati, 310 F.3d 484, 492 (6th Cir.

9

2002)."  Boone v. Spurgess, 385 F.3d 923, 933 (6th Cir. 2004)(citing Graham v. Connor, 490

U.S. 386 (1989), which held that a specific constitutional guarantee-that all seizures be

reasonable-trumps a more general guarantee-that all government action conform with substantive

due process.).  The Supreme Court has also suggested in a footnote that,

> the Due Process Clause protects a pretrial detainee from the use of excessive
> force that amounts to punishment.  After conviction, the Eighth Amendment
> "serves as the primary source of substantive protection . . . in cases . . . where the
> deliberate use of force is challenged as excessive and unjustified."  Any
> protection that "substantive due process" affords **convicted** prisoners against
> excessive force is, we have held, at best redundant of that provided by the Eighth
> Amendment.

Graham v. Connor, 490 U.S. 386, 395, n. 10 (1989)(emphasis added)(quoting Whitley v. Albers,

475 U.S. 312, 327 (1979)).  Thus, it appears that in cases such as these, where a pretrial detainee

no longer in the custody of the arresting officer alleges excessive force, that claim is analyzed as

a violation of the Fourteenth Amendment Due Process Clause, and is analogous to a convicted

prisoner's claim under the Eighth Amendment of cruel and unusual punishment.

"[T]he Eighth Amendment places restraints on prison officials, who may not, for

example, use excessive physical force against prisoners."  Farmer v. Brennan, 511 U.S. 825, 832

(1994).  "[T]he Supreme Court set forth the standard for analyzing excessive force claims under

the Eighth Amendment: 'whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm.'"  Combs v. Wilkinson, 315 F.3d 548,

556 (6th Cir. 2002)(quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).


McGuckin cites an unpublished Western District of Michigan case to support his

contention that Leary's excessive force claim should be dismissed because he lacks medical

verification of his injuries.  In <u>Reeves v. Perez</u>, 2005 WL 2045831 (W.D. Mich. 2005), the court granted summary judgment against the plaintiff on his excessive force claim.  The plaintiff alleged that the prison guards twisted and bent his hands, fingers, and wrist so forcefully that it caused bleeding and nerve damage.  Defendants claimed that they were called to the plaintiff's cell to escort him to another cell in order to strip search him, and that the plaintiff resisted their efforts.  The court held that because the plaintiff never sought medical attention for these allegedly serious injuries, even though he requested medical attention for other very minor afflictions, and there was no medical record of his allegedly serious injury, no jury could reasonably find for the plaintiff.

This case is distinguishable.  First, there is no legitimate penological reason for the application of force that is alleged here.  Second, Leary does not claim serious injury from the blow that could be verified by medical records.  Therefore, in this case, the mere absence of medical records verifying the alleged strike is insufficient to sustain McGuckin's motion for summary judgment.  Rather, the Court must analyze the alleged use of force against the relevant standards.

"In order to constitute a claim under the Eighth Amendment, the offending conduct must reflect an 'unnecessary and wanton infliction of pain.'"  <u>Moore v. Holbrook</u>, 2 F.3d 697, 700 (6th Cir. 1993)(<u>quoting</u> <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977).  "The objective component of an Eighth Amendment claim requires that the pain be serious."  <u>Id</u>.  In analyzing the subjective component, the Court must determine whether the force used was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  <u>Combs</u>, 315 F.3d at 556.  Thus, "[t]o determine whether a claim of assault rises to a level of

constitutional magnitude, a court must consider the reasons or motivation for the conduct, the type of force used, and the extent of the inflicted injury." Moore, 2 F.3d at 700. However, "[n]o actual injury needs to be proven to state a viable Eighth Amendment claim." Id. In this case, the alleged force used could not be considered a good-faith effort to maintain or restore discipline because McGuckin does not contend that the force was used to maintain or restore discipline, only that it was *de minimis*. Thus, it appears McGuckin "karate chopped" Leary maliciously or sadistically as punishment for his rape charge. Even though Leary does not claim the amount of force used caused serious injury, he does allege that he endured pain, suffering, and injury. Compl. at 9, para. 43. Although McGuckin argues that the amount of force used was *de minimis*, the Court must view the facts in a light most favorable to Leary. See Hunt, 526 U.S. at 549. In doing so, the Court must accept Leary's allegations that as a result of the blow, he experienced pain and suffering. Therefore, under the relevant analysis, McGuckin is not entitled to summary judgment on Leary's excessive force claim.

**D.     The Deliberate Indifference Claim**

Leary does not extend an argument regarding McGuckin's liability under this theory. However, Leary does contend that the evidence, including Defendant Stone's own statements, clearly establish that Stone was aware that the inmates would turn against Leary once they learned that he was an accused child molester. Leary contends that despite knowing that such violence would ensue, Stone advised the inmates in the general population that Leary was a "baby-raper" and a "pervert," and that he had, in fact, raped a nine year-old girl. Leary also maintains that Stone knew that none of the other corrections officers would come to Leary's aid, as he indicated to Leary that "once the other inmates [find] out what [you] did there [will] be no

12

protection from anyone here at the jail."  Pl.'s Ex. 2, Statement of Stone.  Leary argues that such foreknowledge on the part of Stone speaks volumes to the fact that such misbehavior and ambivalence is commonplace at the Livingston County Jail.  Moreover, Leary contends that Stone, in essence, instructed inmate Glover to assault Leary by advising him that the guards would look the other way if something were to happen to Leary.

Stone's motion for summary judgment is based almost entirely on the assertion that there is no admissible evidence to support Leary's claim.  Specifically, Stone contends that there is no evidence: that he was aware of facts from which he could draw an inference that Leary faced a substantial risk of serious harm; that he drew such an inference; that he suggested, induced, or otherwise facilitated the attack; or, any evidence that he had any contact with the inmates that perpetrated the attack.  Having determined the admissibility of Plaintiff's evidence, the Court must still determine whether McGuckin and Stone are nevertheless entitled to summary judgment.

The Eighth Amendment's prohibition on cruel and unusual punishment, applicable through an analogous Fourteenth Amendment due process right, obligates prison officials to provide humane conditions of confinement.  The obligation to provide humane conditions includes the duty to "take reasonable measures to guarantee the safety of the inmates themselves."  Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).  This duty includes the duty "to protect prisoners from the violence at the hands of other prisoners."  Cortes-Quinones v. Jimenez-Nettle ship, 842 F.2d 556, 558 (1st Cir. 1988)(quoted in Farmer v. Brennan, 511 U.S. 825, 833 (1994)).  "Prison conditions may be restrictive and even harsh, . . . but gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological

13

objective' . . . ." <u>Farmer</u>, 511 U.S. at 833.

In order to show that a prison official violated a prisoner's Eighth Amendment right to be free of cruel and unusual punishment, the prisoner must show that the deprivation was objectively, sufficiently serious, and that the prison official had a sufficiently culpable state of mind. <u>Id</u>., at 834. For claims alleging failure to prevent harm, in order to satisfy the objective component of the test, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." <u>Id</u>. The subjective component in prison-conditions cases mandates the plaintiff establish the defendant possessed a state of mind of "deliberate indifference" to inmate health or safety. <u>Id</u>. "[D]eliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." <u>Id</u>., at 835. Deliberate indifference is equivalent to recklessly disregarding a risk of serious harm to a prisoner. <u>Id</u>., at 836. However,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

<u>Id</u>., at 837.

McGuckin has discharged his burden by pointing out to the Court "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325. Leary, in turn, has not met his burden to set forth specific facts showing a genuine triable issue regarding McGuckin's involvement in the prisoner assault. FED. R. CIV. P. 56(e); <u>Chao</u>, 285 F.3d at 424. Therefore, McGuckin is entitled to summary judgment on Leary's deliberate

indifference claim.

However, Leary has shown that a material question of fact exists whether he was "incarcerated under conditions posing a substantial risk of serious harm" once Stone told the other inmates that he was a child molester.  Farmer, 511 U.S. at 834.  This is evidenced by Stone's admission that "once the other inmates found out what he did that there would be no protection from anyone here at the jail."  Pl.'s Resp. Br., Ex. 2, Statement of Stone.  The obvious inference to draw from that statement is that Stone knew Leary would be incarcerated under conditions posing a substantial risk of serious harm once the other inmates learned that he was a child molester.  Thus, drawing all reasonable inferences in Leary's favor, he was incarcerated under conditions posing a substantial risk of serious harm, and that Stone recklessly disregarding that risk when he told at least two other inmates.  See Hunt v. Cromartie, 526 U.S. 541, 549 (1999), Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003); Farmer, 511 U.S. at 836.

Moreover, Leary "need not show that a prison official acted or failed to act with the specific knowledge that harm "would befall an inmate," or that he was "especially likely to be assaulted by the specific prisoner who eventually committed the assault."  Id., at 842, 843 ("Nor may a prison official escape liability for deliberate indifference by showing that . . . he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.").  Rather, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id., at 842.  In other words,

> The question under the Eighth Amendment is whether prison officials, acting with
> deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of
> serious damage to his future health," Helling, 509 U.S., at 35, 113 S.Ct., at 2481,
> and it does not matter whether the risk comes from a single source or multiple
> sources, any more than it matters whether a prisoner faces an excessive risk of
> attack for reasons personal to him or because all prisoners in his situation face

15

such a risk.

Id., at 843. "There is sufficient evidence to allow the jury to draw the conclusion that [Defendant] knew of a threat to [Plaintiff's] safety and yet disregarded it, despite the availability of relatively effortless ways of addressing it, and that [Defendant's] conduct amounted to a conscious lack of concern or aloofness." Nelson v. Overberg, 999 F.2d 162, 166 (6th Cir. 1993).

### E.    The Unconstitutional Policy and Failure to Train Claims

To impose § 1983 liability on a municipality, plaintiff must show that an officially executed policy, toleration of a custom, or a *de facto* policy resulted in a constitutional deprivation. Doe v. Claiborne County, Tenn. By and Through Claiborne County Bd. of Educ., 103 F.3d 495, 507 (6th Cir. 1996). A municipality may be liable only when its policies are the moving force behind the alleged constitutional violation. City of Canton v. Harris, 489 U.S. 378, 389 (1989). A plaintiff must "identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy." Garner v. Memphis Police Dep't, 8 F.3d 358, 367 (6th Cir. 1993). "A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." Miller v. Calhoun County, 408 F.3d 803, 814-815 (6th Cir. 2005)(quoting Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis, 361 F.3d 898, 902, 86 Fed. Appx. 137 (6th Cir. 2004)).

Although §1983 does not allow municipalities to be sued under a theory of *respondeat superior*, a failure to train is a cognizable claim if it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." Harris, 489 U.S. at 388. Only where

16

a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.  Id.  Deliberate indifference in this context requires proof that a governmental entity disregarded a known or obvious consequence of its action.  Stemler v. City of Florence, 126 F.3d 856, 865 (6th Cir. 1997).  "[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond."  Id., at 865.

Likewise, inadequate training may amount to a municipality's policy where, in light of the duties assigned to specific officers, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  Harris, 489 U.S. at 388.  The fact that an officer may be unsatisfactorily trained is not sufficient to find liability because the officer's shortcomings may have resulted from factors other than a faulty training program.  Id.  Similarly, alleging that an officer could have been better trained is insufficient, because such claim could be made about almost any encounter resulting in injury.  Id.

       1.    Livingston County

Livingston County argues that it is not a proper defendant because under Michigan statutory law, the County is not responsible for the acts of the Sheriff.  This argument has been rejected by the Sixth Circuit:

> It is clear that under the Michigan Constitution of 1963 Art. 7, Section 6, Wayne County did not make policy for the Sheriff's Department.  The Sheriff is,

17

however, the law enforcement arm of the County and makes policy in police matters for the County.  *See* Michigan Constitution 1963 Art. 7, Section 4.  The County, through its Board of Supervisors, appropriates funds and establishes the budget for the Sheriff's Department.  The Sheriff is elected by the voters of Wayne County.  No doubt he is responsible for enforcing state law and presumably federal law as well.  But equally clearly he is not an official of the State of Michigan or of the federal government.  He is, under the Constitution of Michigan, the law enforcement officer for the County of Wayne with extraordinary power to select his deputies and enforce the law.

We believe that the relationship between the County and the Sheriff's Department is so close as to make the County liable for the Sheriff's failure to train and discipline his officers and his ratification of the use of wanton brutality by members of his force which we have spelled out above.  Obviously this holding is consistent with and indeed compelled by the U.S. Supreme Court's decision in Brandon v. Holt, *supra*.  The County's reliance on Michigan law to exempt it from liability is clearly inappropriate under Brandon and for that matter under the federal Constitution's Supremacy Clause, *supra*.

Marchese v. Lucas, 758 F.2d 181, 188-89 (6th Cir. 1985).  Livingston County does not cite this case or argue why it is no longer controlling law in the Sixth Circuit.  Thus, the County has not proffered a meritorious reason why the Court should excuse it from the suit.

Next, "[a] suit against an individual 'in his official capacity' has been held to be essentially a suit directly against the local government unit and can result in that unit's liability to respond to the injured party for his injuries."  Leach v. Shelby County Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1990).  Leary's suit against the the Sheriff in his official capacity is essentially, and for all practical purposes, a suit against the County itself.  Id., at 1245-46.  "The issue, therefore, is whether there was a policy or custom so attributable to the municipality as to render it responsible for payment of the damages found."  Id., at 1246.

Leary alleges in his complaint that the County had a custom or practice of allowing and/or encouraging officers to taunt, harass, and assault inmates, single out sex offenders for abuse, and encourage or provoke inmate violence against sex offenders.  He also alleges that the

18

County was deliberately indifferent to his constitutional rights by failing to train, supervise, and prosecute correction officers guilty of abuse, condoning illegal and unconstitutional behavior, and failing to investigate inmate abuse.

Leary has proffered evidence that Homan, and thus the County, was aware that child molesters face a higher risk of assault by other inmates. However, he has not presented evidence that establishes Homan knew that prison officials regularly disclosed an accused child molester's charges to other inmates in order to mete out vigilante justice. Thus, he has failed to show "that the municipality was aware of prior unconstitutional actions of its employees and failed to respond." Stemler, 126 F.3d at 865. Therefore, Leary has failed to establish a *prima facie case* that the County had a *de facto* custom or policy of disclosing inmate charging information in order to facilitate inmate assault.

However, Leary also alleges that the County's written policy explicitly authorized prison officials to disclose inmate charging information in order to facilitate inmate assaults, and thus, the County was deliberately indifferent to his safety. The policy sections in issue read as follows:

> 9.8 - Conversation regarding inmates and their cases shall be closely regulated so as to protect privacy rights and provide for an orderly jail operation.
>
> Procedure
> I. Discussion of an inmate's case, other than bond, judge assignment, and the charge is not permitted.
> . . . .
>
> 14.2 - Inmates shall be supervised in a way that promotes positive staff/inmate relations and ensures an orderly, safe and controlled jail environment.
>
> Procedure
> . . . .

III. Jail personnel shall:
    A. Supervise inmates in a manner that is fair, firm, and consistent.
    B. Ensure that inmates comply with all jail rules and regulations.
    C. Ensure that inmates do not control, supervise, or intimidate other inmates.
    D. Not degrade, intimidate, gossip about, or show favoritism to inmates.
    . . . .

Livingston County Sheriff Dep't Policy Directives 9.8 & 14.2.  These policies on their face,
cannot be read in a manner that allows prison officials to release inmate information in order to
facilitate inmate assault, even though Procedure number 9.2, taken out of context, allows
officials to discuss an inmate's charges.  The policies make it clear that discussing such
information with other inmates is a violation of the letter and spirit of the policies, and thus, are
not the "moving force" behind the alleged constitutional violation.  Harris, 489 U.S. at 389.
Therefore, Leary's unconstitutional policy or custom claim against the County fails.

      Leary has failed to show that the County knew that inmate assaults were likely because
prison guards shared sensitive information.  Thus, Leary has failed to show that, in light of its
current policies, the need for more or different training was so obvious, and that the inadequacy
of the training was so likely to result in constitutional rights violations, that the County can
reasonably said to be deliberately indifferent to his safety.   See Harris, 489 U.S. at 388.
Although Leary has shown that Homan was aware that child sex offenders were at a higher risk
of assault, he has not shown that he knew the elevated risk was due to a failure to train prison
officials not to disclose an inmate's sensitive information to other inmates.  Nor has Leary shown
that the County has failed to act in response to repeated complaints of constitutional violations.
Cherrington v. Skeeter, 344 F.3d 631, 646 (6th Cir. 2003).  Therefore, Leary's failure to train
claim against the County and Sheriff Homan in his individual capacity, fails.

      2.     Supervisory Liability - Sheriff Homan in his individual capacity

20

Leary alleges Homan failed to train and supervise the corrections officers with respect to the need to prevent publication or dissemination of inmate information, the proper use of force, determining when an inmate is at risk for harm, and reporting the misconduct of fellow officers. Leary also contends that Homan is liable as a supervisor because he failed to discipline officers for: disseminating inmate information, orchestrating assaults, harassing and intimidating inmates, allowing inmates to single out sex offenders for harassment and abuse, using excessive force, failing to remove inmates at risk for assault, and failing to report officer misconduct.

It is clear that supervisory personnel may be held liable under § 1983 in their individual capacities for their own constitutional violations. Haynesworth v. Miller, 820 F.2d 1245, 1259 (D.C. Cir. 1987)("It is well established that a governmental officer may be held liable in damages for constitutional wrongs engendered by his failure to supervise or train subordinates adequately."); see also Risbridger v. Connelly, 275 F.3d 565, 573 n 7 (6th Cir. 2002) (dismissing on qualified immunity grounds a plaintiff's claim for supervisory liability brought against defendant in his individual capacity); Walker v. Norris, 917 F.2d 1449, 1457 (6th Cir. 1990) (affirming directed verdict on plaintiff's claim of supervisory liability brought against defendants in their individual capacity). But, liability will not attach based on a theory of *respondeat superior*. The Sixth Circuit Court of Appeals has held:

> Section 1983 liability will not be imposed solely on the basis of *respondeat superior*. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

Taylor v. Mich. Dept. of Corr., 69 F.3d 76, 81 (6th Cir. 1995)(quoting Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).

21

Thus, the only manner in which individual liability could attach, according to Leary's allegations, is if there is a material question of fact whether Homan implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct.  Leary contends that Homan's authorization, approval, or knowing acquiescence is established by virtue of: the written policy, which as Sheriff, he is responsible for promulgating that allows disclosure of inmate information; his knowledge that sex offenders are at a higher risk of violence from other inmates; his failure to train officers in the need to prevent dissemination of inmate information to other inmates; his failure to adequately investigate the officers for their conduct; and, his failure to adequately discipline the culpable officers.

First, Leary's claim that Homan encouraged the specific incident of misconduct, or in some other way directly participated in it because he failed to adequately train his subordinates, is indistinguishable from the analysis of whether the County is liable for failure to train.  That analysis revealed that Leary failed to establish that claim because there is no evidence that Homan failed to act in response to repeated complaints of constitutional violations.  Nor is there evidence that the need for more or different training was so obvious, and that the inadequacy of the training was so likely to result in constitutional rights violations, that the Sheriff can reasonably said to be deliberately indifferent to his safety.

Likewise, Leary's claim that Homan approved the constitutional violation because he promulgated a written policy that allowed dissemination of inmate information is unsustainable. As discussed above, the policies make it clear that discussing such information with other inmates is a violation of the letter and spirit of the policies, and thus, are not the "moving force" behind the alleged constitutional violation.  Harris, 489 U.S. at 389.

22

However, Leary makes a more compelling case that Homan is liable in his supervisory role because he implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate by failing to adequately investigate or discipline his subordinates.  Taylor, 69 F.3d at 81.

After an internal investigation revealed possible complicity by prison guards, Homan requested a Mission Team to investigate the allegations of prison guard complicity.  Although Leary contends that the sole focus of the investigation was to discover culpability of the inmates, the deposition testimony cited does not support that contention.  However, when the investigators did discover possible complicity by the guards, that information was given to the Livingston County Sheriff's department as well as the County Prosecutor.  The County prosecutor refused to prosecute McGuckin, unless he failed a lie detector test.  McGuckin never took one.  McGuckin was not disciplined.  Stone was suspended without pay for one day for violating departmental policy directives 9.8 and 14.2.

Leary also contends that five documents generated by the County's internal investigation showing guard complicity in the attack were withheld from the outside investigators, and include: an interview with inmate Glover, in which he stated that within minutes of Leary's incarceration, he knew what Leary was charged with; an interview with inmate Holley, in which he stated he warned a guard that Leary was in imminent danger; Stone's handwritten statement; interview with inmate Riley, in which he stated he overheard Stone telling inmates Glover and Hinchey that Leary was charged with raping a nine year-old; and, an interview with inmate Hinchey, in which he stated that corrections officers told him and Glover that Leary was a "baby raper" and a "pervert," and that an officer congratulated him after Leary was assaulted.

23

The alleged failure to investigate is not sufficient to sustain Leary's claims.  Homan initiated an internal investigation and an outside investigation by the Mission Team once allegations of official complicity surfaced.  The scope of the Mission Team investigation, as reported by Sgt. Fontana, was to investigate the allegations that the inmate assault on Leary was protected or encouraged by corrections officers.  Leary makes much of the fact that the County withheld internal investigative reports where certain inmates were interviewed.  However, nothing prevented the Mission Team from interviewing every inmate at the prison at the time of the assault.  More troubling is the fact that the County withheld Stone's handwritten statement, where he admits to telling other inmates that Leary was a sex offender.  Homan contends that it was withheld because it was a <u>Garrity</u> statement.  Leary has not presented a compelling argument as to why Stone's statement would not qualify as such.  Thus, it can not be said that conducting an internal investigation, and then handing the investigation of official complicity to outside investigators, amounts to Sheriff Homan encouraging the specific incident of misconduct in question.  <u>Cf</u>. <u>Leach v. Shelby County Sheriff,</u> 891 F.2d 1241, 1248 (6th Cir. 1989), <u>Marchese v. Lucas</u>, 758 F.2d 181, 188 (6th Cir. 1985)(lack of serious investigation, corrective action, or discipline in light of a constitutional violation was a ratification of the act sufficient to attach liability to Sheriff).

Finally, the discipline, or lack thereof, meted out is not evidence that Homan encouraged the constitutional deprivation inflicted by Stone, but is evidence that he ratified McGuckin's behavior.  Faced with an external investigation that ostensibly cleared the guards of a conspiracy to have fellow inmates assault Leary, Stone was nevertheless disciplined for telling other inmates that Leary was a child molester.  However, even though the Mission Team found Leary's

allegations against McGuckin to be substantiated, the county prosecutor refused to prosecute. Nor was McGuckin disciplined by the Sheriff. Although there is no evidence that Homan had any input in the prosecutor's decision, he did refuse to discipline an officer that, in the opinions of the Mission Team members, assaulted an inmate without provocation or legitimate penological objective. Therefore, there is a material question of fact whether Homan implicitly authorized, approved, or knowingly acquiesced in McGuckin's alleged unconstitutional conduct by failing to adequately discipline him. See Taylor, 69 F.3d at 81. However, because Homan did discipline Stone for his actions, Homan cannot be held liable in a supervisory capacity for those acts.

### E.      Qualified Immunity

Qualified immunity is an affirmative defense that shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The United States Supreme Court has set forth a two-prong test to determine whether an officer-defendant is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 200 (2001). The first prong requires the reviewing court to inquire whether the facts, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right." Id. at 201. The court must "concentrate at the outset on the definition of the constitutional right and [then] determine whether on the facts alleged, a constitutional violation could be found." Id. 207. If a constitutional violation could be found, the second

25

prong requires the court to decide whether a reasonable official would, at the time the act was committed, understand that his conduct violated that right.  Id. at 201.  A government official will be entitled to immunity as long as the conduct does not amount to a violation of a clearly established right of which a reasonable person would have known.  Harlow, 457 U.S. at 818.  A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted."  Saucier, 533 U.S. at 202.

As discussed above, looking at the facts in a light most favorable to Leary, he has shown that McGuckin's and Stone's conduct violated his constitutional rights.  Saucier, 533 U.S. at 201.  Therefore, the question becomes whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Id. at 201.

In McGuckin's situation,[4] even though he does not advance an argument as to why he would be entitled to qualified immunity, it would nevertheless "be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted."  Saucier, 533 U.S. at 202.  Striking a detainee, regardless of whether serious injury was caused, without provocation or a legitimate penological objective is without question unlawful.  Hudson v. McMillian, 503 U.S. at 7, Combs, 315 F.3d at 556.  Therefore, McGuckin is not entitled to qualified immunity.

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners," Farmer, 511 U.S. at 833 (quoting Cortes-Quinones, 842 F.2d at 558) and those officials have an obligation to "take reasonable measures to guarantee the safety of the inmates."

---

[4] McGuckin does not argue that he is entitled to qualified immunity for allegedly striking Leary, but argues he is entitled to summary judgment on Leary's deliberate indifference claim. Because McGuckin is entitled to summary judgment on the deliberate indifference claim, there is no need for qualified immunity for that claim.

Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).  Other circuits have held that a prisoner's

constitutional rights were violated when a guard spread a rumor that the prisoner was a "snitch,"

Northington v. Marin, 102 F.3d 1564, 1567-68 (10th Cir. 1996)(Defendant was liable for Eighth

Amendment violation for denying an inmate humane conditions of confinement because guard

knew the probable result of spreading rumor would be that the prisoner would be beaten.), Reece

v. Groose, 60 F.3d 487 (8th Cir. 1995)(denying qualified immunity to prison guards sued for

failing to protect inmate labeled as a snitch from assault by another prisoner.), Valandingham v.

Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989)(Prisoner's complaint in which he alleged that

two guards had conspired to label him a "snitch" and thereby subject him to retaliation by

inmates after he sought to petition prison and government officials for redress of grievances

stated a cause of action for violation of civil rights.), Harmon v. Berry, 728 F.2d 1407, 1409

(11th Cir. 1984) (same), Gullatte v. Potts, 654 F.2d 1007, 1012 (5th Cir. 1981) (same).

> "'[P]rison officials have a duty . . . to protect prisoners from violence at the hands
> of other prisoners.' "  As previously stated, this duty requires prison officials to
> take reasonable measures to abate substantial risks of serious harm, of which the
> officials are aware.  That is the "clearly established constitutional right" in this
> case.

Reece, 60 F.3d at 491 (citations omitted).  Leary had a clearly established Eighth Amendment

right to be free of violence from other prisoners, and "to be free from a prison official's

deliberate indifference to his well-being . . . ."  Nelson v. Overberg, 99 F.2d 162,164 (6th Cir.

1993).  "*Roland* established the Eighth Amendment rights of prisoners with sufficient

particularity that, by 1989, there could have been no reasonable doubt that such a right existed."

Id., at 166 (citing Roland v. Johnson, 856 F.2d 764 (6th Cir. 1988)).  Moreover, a plaintiff's

Eighth Amendment right to be free from violence at the hands of another inmate has been clearly

established since at least 1982.  See Stewart v. Love, 696 F.2d 43 (6th Cir. 1982).  In addition,

Stone had a clearly established duty to take reasonable measures to prevent substantial risks of

serious harm to the prison population.  Stone's own statements evidence his knowledge that

Leary would face a substantial risk of serious harm should the other inmates discover that he was

charged with raping a minor.  Even armed with this knowledge, Stone admits that he told at least

two inmates that Leary was being charged with raping a nine year-old girl.  Stone's knowledge

coupled with his reckless disregard of the risks to Leary's safety is a violation of his clearly

established right to be free of violence at the hands of other prisoners, and a breach of Stone's

duty to take reasonable measures to prevent a substantial risk of serious harm of which he was

aware.  See Reece, 60 F.3d at 491.  "[T]here clearly exists questions of material fact concerning

the behavior of the defendants with respect to the injuries allegedly suffered by the plaintiff, and

whether that behavior under the circumstances of this case amounts to a deliberate indifference

to the plaintiff's safety."  Nelson, 99 F.2d at 166-67.  Therefore, Stone is not entitled to qualified

immunity because "it would be clear to a reasonable officer that his conduct was unlawful in the

situation that he confronted."  Saucier, 533 U.S. at 202.

IV.     **CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Magistrate Judge Steven D. Pepe's May 31, 2006, Order is **AFFIRMED.  IT IS FURTHER ORDERED** that defendant Stone's Motion for Summary Judgment (Doc. #67) is **DENIED.  IT IS FURTHER ORDERED** that McGuckin's Motion for Summary Judgment (Doc. #65) is **GRANTED** in part, and **DENIED** in part.  **IT IS FURTHER ORDERED** that Plaintiff's Deliberate Indifference claim against defendant McGuckin is **DISMISSED.  IT IS FURTHER ORDERED** that defendants Livingston County and Sheriff Homan's Motion for Summary Judgment (Doc. #66) is **DENIED** in part and **GRANTED** in part.  **IT IS FURTHER ORDERED** that Plaintiff's Counts III and IV against Livingston County is **DISMISSED.  IT IS FURTHER ORDERED** that Plaintiff's Count IV, to the extent that it is based on defendant Homan's failure to train or supervisory liability based on defendant Stone's conduct, is **DISMISSED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: October 5, 2006

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by  electronic filing.

s/Bernadette M. Thebolt
DEPUTY CLERK